UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

STAVROULA ARVANITAKIS,

                Plaintiff,

    - against -

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

-------------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
12-CV-1232 (CBA)

**AMON, Chief United States District Judge.**

    Plaintiff Stavroula Arvanitakis, proceeding pro se, has petitioned for review of the Commissioner's denial of disability insurance benefits. On March 31, 2014, this Court issued an order finding that the case must be remanded for further administrative proceedings because the ALJ failed to properly apply the treating physician rule. At that time, however, the Court did not issue a formal opinion remanding the action and instead directed defendant to advise the Court as to whether Arvanitakis is eligible for relief under the terms of the Padro v. Astrue class action settlement.[1] Arvanitakis was directed to advise the Court as to whether she wished to proceed under the terms of that settlement.

    On April 3, 2014, defendant advised the Court that Arvanitakis had been identified as a potential class member under the terms of the Padro v. Astrue settlement but that, as of that date, she had not requested relief pursuant to the settlement. (Docket Entry ("D.E.") # 28.) Since then, Arvanitakis has not advised this Court as to whether she would like to proceed under the

---

[1] In the Padro class action, claimants whose social security disability benefits had been denied by one of five named Administrative Law Judges ("ALJs")—including the ALJ in the instant case—alleged that the named ALJs systematically deprived social security claimants of their right to a full, fair, and non-adversarial hearing before an impartial adjudicator. Padro v. Astrue, No. 11-CV-1788(CBA)(RLM), 2013 WL 5719076, at *1 (E.D.N.Y. Oct. 18, 2013). The Padro class action settlement, which this Court approved on October 18, 2013, provided that any class member whose claim for disability benefits was adjudicated by one of the named ALJs, and was either denied or partially denied between January 1, 2008 and October 18, 2013, was entitled to readjudication of his or her claim before a different ALJ. Id. The settlement required that class members affirmatively request readjudication within sixty days of receiving notice of their right to relief. Id.

1

terms of the settlement. Accordingly, consistent with the Court's March 31, 2014 order, the Court remands the action for further administrative proceedings pursuant to 42 U.S.C. § 405(g) for the reasons set forth below.[2]

## BACKGROUND

### I.   Procedural History

Arvanitakis filed an application for disability insurance benefits on May 5, 2003. In it, Arvanitakis stated that she had been disabled since November 12, 2002 due to back pain, panhypopituitarism, right knee lethargy, and further stated that she had "no immune system." (Administrative Record, D.E. # 24, 25 ("Tr.") at 41-44.) Her claim was initially denied and then denied upon reconsideration on February 24, 2004. (Tr. 30-32.) Arvanitakis requested a hearing, (Tr. 33-34), which was held on April 11, 2006 before ALJ Seymour Fier. (Tr. 816-38.) On June 28, 2006, ALJ Fier issued a decision finding that Arvanitakis was not disabled. (Tr. 14-19.) Arvanitakis requested a review of the hearing decision on July 31, 2006, which the Appeals Council denied on May 1, 2009. (Tr. 3.) On July 6, 2009, Arvanitakis initiated a civil action in this Court, Arvanitakis v. Commissioner of Social Security, 09-CV-2926(CBA). The parties agreed to the voluntary remand of that case for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

The Appeals Council issued an order on April 1, 2010 remanding the case to ALJ Fier. (Tr. 876-80.) The Appeals Council directed the ALJ on remand to (1) give further consideration to Arvanitakis's maximum residual functional capacity ("RFC"), including specific references to evidence in support of his assessment of her limitations; (2) obtain evidence from a medical

---

[2] Although the settlement agreement releases the Commissioner from certain claims, the agreement explicitly provides that the terms of the section entitled "Releases" "are not designed otherwise to interfere with the rights of . . . the members of the Class . . . under 42 U.S.C. § 405(g) and its implementing regulations." (See Settlement Agreement, Padro v. Astrue, No. 11-CV-1788(CBA)(RLM), D.E. # 112-1 § X.)

expert with knowledge of panhypopituitarism to clarify the nature and severity of Arvanitakis's impairments; and (3) obtain evidence from a vocational expert regarding the effect of Arvanitakis's impairments on her occupational base. (Tr. 878-79.) ALJ Fier held a second hearing on June 29, 2010. (Tr. 1037-67.) On August 2, 2010, ALJ Fier issued a decision finding that Arvanitakis was not disabled from November 12, 2002, her alleged onset date, through June 30, 2006, her date last insured. (Tr. 853-62.) Arvanitakis filed the instant action on March 7, 2012.

## II.    Non-Medical Evidence

Arvanitakis was born in 1946 in Greece and became a United States citizen in 1979 or 1980. (Tr. 818-19.) She completed the eighth grade and later earned her GED. (Tr. 819.) When she applied for disability benefits on May 5, 2003, Arvanitakis claimed that she became disabled on November 12, 2002 due to back pain, panhypopituitarism, right knee lethargy, and stated that she had "no immune system." (Tr. 41.)

In a disability report submitted with her application, Arvanitakis indicated that she worked in data entry during the summers from 2000 to 2002, and that she worked as an office clerk for a vegetable delivery service for 15 years before that. (Tr. 52.) Arvanitakis indicated that during her 15 years as an office clerk, she made phone calls, kept the books, and made deliveries. (Id.) She reported spending a total of four hours a day walking, seven hours a day standing, and one hour a day sitting, occasionally lifting bags of potatoes and onions weighing up to 50 pounds. (Id.)

In the same disability report, Arvanitakis stated that she began treatment with Dr. Enrico Ocampo in January 2001, who prescribed her Genotropin, HCTZ, Premarin, hydrocortisone, medroxyprogesterone, and Synthroid to treat her panhypopituitarism. (Tr. 53, 56.) Arvanitakis

3

also stated that she began seeing Dr. Elias Kassapidis in November 2002 for back pain, and that she saw Dr. Thomas Mastakouris for general treatment. (Tr. 53-54.)

In a Function Report completed on December 5, 2003 in support of her application, Arvanitakis described her daily activities as light housekeeping. (Tr. 75.) She reported being unable to sleep at night and stated that she could not keep a regular schedule. (Id.) She stated that she prepared meals daily, but avoided making complicated meals. (Id.) Arvanitakis indicated that she was still able to clean, iron, shop, drive, and handle her own finances. (Tr. 76-77.) She reported limitations on her ability to lift, stand, kneel, and climb. (Tr. 78.)

At a hearing before ALJ Fier on April 11, 2006, Arvanitakis testified that she stopped working in 2002 because she went to the hospital three times that year and her seasonal job had ended. (Tr. 819-20.) She testified that she saw several doctors on a regular basis: Dr. Ocampo, her endocrinologist; Dr. Mastakouris, her primary care physician; and Dr. Kassapidis, who treated her for her back and knee problems. (Tr. 822-23.) Arvanitakis further testified that she was unable to "do much of anything," and each morning began with taking her injections and pills. (Tr. 824.) She testified that she had to take frequent breaks during the day while she did light housework, such as making the bed or picking up clothes. (Id.) Arvanitakis testified that she drove her car about every other day, but only for short distances. (Tr. 825.) She stated that she had traveled to Greece for two weeks in November 2005. (Tr. 831-32.)

At the second administrative hearing on June 29, 2010, Arvanitakis testified that she stopped working in 2002 because she was weak, fatigued and could not complete a day of work. (Tr. 1040.) When her summer job ended, she did not look for other work. (Tr. 1041.) The ALJ informed Arvanitakis that the record indicated that she collected unemployment benefits until August 2003, almost a year after the time that she indicated her disability began. (Tr. 1041-45.)

4

Arvanitakis insisted that the record contained an error, and that she never collected unemployment benefits during the time she indicated she was disabled. (Tr. at 1045.)

Arvanitakis further testified that after taking a two-week trip to Greece in 2005, she traveled to Greece again in 2010 for four days; both trips were to visit her brother, who was diagnosed with stage four cancer. (Tr. 1046, 1050-51.) Arvanitakis testified that there were no restrictions on her driver's license and that she was able to drive short distances. (Tr. 1051-53.)

Amy Leopold, a vocational expert, testified at Arvanitakis's second administrative hearing. (Tr. 853, 1064-66.) Ms. Leopold stated that Arvanitakis's most recent job qualified as a data entry clerk under section 203.582-054 of the Dictionary of Occupational Titles ("DOT"). (Tr. 1064.) She stated that the job's physical demands qualified it as sedentary work. (Id.) Ms. Leopold also testified that Arvanitakis's job prior to that, as an office clerk, was defined under section 209.562-013 of the DOT and that the job was physically "light." (Id.) Ms. Leopold stated that if Arvanitakis had a residual functional capacity ("RFC") to do sedentary work, she could return to her previous work as a data entry clerk. (Tr. 1064-65.)

**III.    Medical Evidence**

A. Prior to Alleged Onset Date (November 12, 2002)

Arvanitakis was admitted to the New York Hospital Medical Center of Queens (NYHQ) on January 12, 2001. (Tr. 251.) Arvanitakis reported a worsening cough, weakness and aches, non-specific abdominal discomfort, loose stools, and feelings of depression. (Id.) Arvanitakis reported taking Prednisone, Estrogen, Synthroid, and hydrocortisone, but stated that she had stopped taking Synthroid because it caused her to show results consistent with hyperthyroidism. (Id.) The consultant's report notes that she was diagnosed with hypopituitarism in 1973 and that she reported that her condition had been deteriorating for two years. (Id.) In her discharge

5

summary, Dr. Mastakouris diagnosed Arvanitakis with panhypopituitarism.[3] (Tr. 187-98.) Arvanitakis was discharged from NYHQ on January 16, 2001, after she stabilized as a result of hormone replacement therapy. (Tr. 198.)

On February 23, 2002, Dr. Ocampo ordered an MRI of Arvanitakis's head that showed that her pituitary gland had thinned and had no mass. (Tr. 89.)

On November 5, 2002, Dr. Kassapidis examined Arvanitakis. (Tr. 102.) Arvanitakis, who had undergone back surgery, complained of back pain. (Id.) Dr. Kassapidis's physical examination found no rashes, lesions, or ulcers, and found that Arvanitakis's lymph nodes were not tender or enlarged. (Id.) Additionally, he found Arvanitakis to be alert and oriented, to have a normal gait, no sensory defects, and to have full strength throughout all of her extremities. (Id.) Dr. Kassapidis's musculoskeletal examination found no misalignment, defect, or deformity in Arvanitakis's head/neck, or in her extremities. (Id.) The doctor recommended that Arvanitakis have an MRI performed. (Id.)

On November 11, 2002, Arvanitakis had an MRI performed on her lumbosacral spine. (Tr. 87-88.) The MRI showed a central and left paracentral herniation at Arvanitakis's L4-5 intervertebral disk, with compression on her thecal sac, with superimposed mild enhancing scar tissue extending central and slightly to the right of midline. (Tr. 87.) Additionally, the MRI showed broad-based bulges at her L2-3, L3-4, and L5-S1 intervertebral disks, with canal stenosis and relative neural foraminal narrowing, as well as a broad-based bulge at her L1-2 intervertebral disk and facet arthropathy. (Id.)

---

[3] As explained in a letter from Dr. Mastakouris, hypopituitarism "is a condition in which the pituitary gland (a small gland in the base of the brain) does not produce one or more of its hormones or not enough of them. When there is low or no production of all the pituitary hormones, the condition is called panhypopituitarism." (Tr. 959.) Panhypopituitarism results in the following symptoms: "fatigue, low blood pressure, weakness, depression, decreased energy, muscle weakness or aching, decreasing strength and exercise tolerance, weight gain and decreased muscle mass." (Tr. 960.)

B. During Relevant Period (November 12, 2002 – June 30, 2006)

On April 23, 2003, Arvanitakis had an MRI performed on her right knee to evaluate a possible medial meniscal tear. (Tr. 103-04.) The MRI found periarticular osteophytic pointing in the lateral knee compartment, thinning of the patellar cartilage, but no chondromalacia patellae or Baker's cysts. (Id.) The MRI showed extensive increased T1 signal in both the lateral and medial menisci without a definite tear extending to the articular surface, compatible with intrasubstance degeneration. (Tr. 104.)

Arvanitakis was admitted to NYHQ on July 15, 2003, complaining of vomiting and weakness. (Tr. 107-86.) She was diagnosed with gastroenteritis, hypovolemia, panhypopituitarism, and hypertension. (Tr. 118.) She was treated with antibiotics and steroids, and was discharged on July 18, 2003, stable and asymptomatic. (Tr. 118, 120.)

Dr. Kassapidis examined Arvanitakis on October 14, 2003, when she complained of pain in her right knee causing her to limp and to use a cane to walk. (Tr. 98.) Dr. Kassapidis recommended Arvanitakis as a candidate for arthroscopic surgery. (Id.) In a follow-up report dated December 2, 2003, Dr. Kassapidis indicated that Arvanitakis received knee arthroscopy one and a half weeks earlier. (Tr. 97.) He noted that Arvanitakis was pleased with the results and experienced diminished pain. (Id.) Dr. Kassapidis's physical examination found no rashes, lesions, or ulcers, and found her lymph nodes were not tender or enlarged. (Id.) Additionally, he found Arvanitakis to be alert and oriented, to have a normal gait, no sensory defects, and to have full strength throughout all of her extremities. (Id.) Dr. Kassapidis's musculoskeletal examination found that Arvanitakis's right knee was essentially well healed, that sutures were removed, and that there was no evidence of drainage. (Id.) Dr. Kassapidis stated that he

believed that the Arvanitakis would do well for the next six months, if not longer, that she would follow up with him as needed, and that she would not require physical therapy. (Id.)

On December 1, 2003, Dr. Ocampo completed a questionnaire provided by the New York State disability agency. (Tr. 91-96.) He diagnosed Arvinitakis with panhypopituitarism, osteopenia, hyperlipidemia, and degenerative joint disease. (Tr. 91.) He indicated that Arvanitakis's symptoms were severe fatigue and pain in her muscles, chest, and knee. (Id.) Dr. Ocampo noted that he had prescribed Synthroid, Permarin, Provera, hydrocortisone, and growth hormone. (Tr. 92.) Regarding Arvanitakis's limitations on physical activity, Dr. Ocampo noted that Arvanitakis was "unable to do sustained activity." (Tr. 94.) He indicated that Arvanitakis could: lift and carry a maximum of ten pounds; stand and/or walk less than two hours per day; sit without limitation; and push and/or pull a limited amount. (Tr. 94-95.) He further stated that Arvanitakis could not be on her feet for extended periods of time. (Tr. 95.)

Arvanitakis was admitted to NYHQ on January 26, 2004. (Tr. 269-75, 282.) An exam showed no acute displaced fracture on her right forearm or elbow. (Tr. 272-74.) Arvanitakis was provided educational materials on muscle spasm and muscle strain, prescribed Percocet, and was discharged the same day. (Tr. 269, 271.)

Arvanitakis returned to the NYHQ emergency room on September 15, 2004 after falling on a subway escalator. (Tr. 280-343.) She said she felt weak and dizzy. (Tr. 282.) Arvanitakis was discharged on September 20, 2004. (Tr. 293-94.) She was directed to take Synthroid, Levaquin, Protonix, Zoloft, hydrocortisone, Metformin, Lopid, Premarin, Provera, Ambien, and Hyzaar. (Tr. 293.) Arvanitakis was permitted to be "up as tolerated" and her condition at time of discharge was "good." (Tr. 293-94.)

Arvanitakis was again admitted to NYHQ and was discharged on March 10, 2005. (Tr. 344-47.) She was advised to resume taking her previous medications, and was also prescribed a new medication, Flagyl. (Tr. 344.)

An MRI performed on Arvanitakis's brain and pituitary gland on March 13, 2005 found an empty sella turcica, no parasellar masses, and no paraspinal masses. (Tr. 279.)

Arvanitakis had an initial evaluation of her right knee by Fotis Tsolis, a physical therapist, on December 15, 2005. (Tr. 358-60.) The evaluation noted that Arvanitakis complained of pain while sitting and could only sit for twenty minutes with bent knees. She reported pain while squatting, climbing and descending stairs, walking and kneeling. (Tr. 358.) Mr. Tsolis observed that Arvanitakis walked with gait deviations, that she felt tenderness along her right vastus medialis oblique ("VMO"), and that there was severe muscle atrophy on the right VMO and calf. (Id.) Mr. Tsolis's assessment was that Arvanitakis had decreased balance and coordination in movement and decreased range of motion and muscle strength in her right knee. (Tr. 358-59.)

On April 8, 2006, Mr. Tsolis completed a "Medical Assessment of Ability to do Work-Related Activities (Physical)" at Arvanitakis's request. (Tr. 353-57.) He indicated that Arvanitakis was limited to frequently lifting five to ten pounds, that she could walk for a total of one-and-a-half hours a day but for only five minutes at a time, that she was limited to sitting for a total of two to three hours per day but only for thirty minutes without interruption. (Tr. 354-55.) He indicated that Arvanitakis could occasionally balance and crouch, but that she could never climb, stoop, kneel, or crawl. (Tr. 355.) Mr. Tsolis indicated that Arvanitakis's ability to reach, handle, feel, push, pull, see, hear, and speak were not impaired. (Tr. 356.)

On April 10, 2006, Dr. Ocampo filled out the same medical assessment form at Arvanitakis's request. (Tr. 361-64.) He indicated that Arvanitakis was limited to frequently lifting 10 pounds, and that she could stand for a total of one hour each day but for only ten minutes without interruption. (Tr. 362.) He noted that her limited ability to walk and stand was due to her dyspnea on exertion. (Id.) Dr. Ocampo stated that her ability to sit was not impaired. (Tr. 362.) He further indicated that Arvanitakis could occasionally balance, but that she could never climb, stoop, crouch, kneel, or crawl. (Id.) He stated that her ability to reach, handle, feel, push, pull, see, hear, and speak was not impaired. (Tr. 363.)

On April 11, 2006, Dr. Mastakouris also completed a medical assessment at Arvanitakis's request. (Tr. 348-52.) He indicated that Arvanitakis was limited to occasionally lifting eight to ten pounds, that she could stand for a total of one hour each day but only for fifteen minutes without interruption, and that her ability to sit was not impaired. (Tr. 349-50.) He indicated that Arvanitakis could never climb, balance, stoop, crouch, kneel, or crawl, but that her ability to reach, handle, feel, push, pull, see, hear, and speak was not impaired. (Tr. 350-51.)

C. After Date Last Insured (June 30, 2006)

Arvanitakis was again admitted to NYHQ on July 21, 2006 after she lost consciousness. (Tr. 396.) She complained of vomiting and feeling lightheaded and generally weak. (Tr. 396, 379-447, 580-94, 634-712.) She also indicated that she had been feeling extremely tired and weak over the last several days before being admitted to NYHQ. (Tr. 396.) Arvanitakis was diagnosed with dehydration and syncope, and was discharged on July 24, 2006 in stable condition. (Tr. 421-26.)

10

Arvanitakis was readmitted to NYHQ on January 18, 2007 for acute gastroenteritis. (Tr. 495-537, 595-619, 713-81.) Arvanitakis's acute gastroenteritis was resolved and she was discharged on January 24, 2007. (Tr. 517, 713.)

In a letter dated April 1, 2010, Dr. Joseph Tibaldi stated that he was treating Arvanitakis for panhypopituitarism and diabetes. (Tr. 914.) He indicated that Arvanitakis "chronically feels fatigued and is unable to function." (Id.) In a letter dated June 11, 2010, Dr. Tibaldi stated that Arvanitakis continued to feel poorly despite her treatment for panhypopituitarism and diabetes, that she had chronic shortness of breath and was unable to perform day-to-day activities. (Tr. 951.) Dr. Tibaldi stated that in his opinion, Arvanitakis was disabled. (Id.)

Dr. Mastakouris wrote a letter dated June 21, 2010, in which he reviewed Arvanitakis's medical history. (Tr. 959-61.) He stated Arvanitakis had been his patient since January 2001. (Tr. 959.) He stated that over the course of the nine years that he treated Arvanitakis, her panhypopituitarism had caused her to experience fatigue, low blood pressure, weakness, depression, decreased energy, muscle weakness or aching, decreased strength and exercise tolerance, weight gain, and decreased muscle mass. (Tr. 960.) He indicated that Arvanitakis was unable to lift more than two to three pounds or to sit for prolonged periods of time. (Id.) Dr. Mastakouris stated that based on her medical history and physical exam, his medical opinion was that she was permanently totally disabled. (Tr. 961.)

## IV. Medical Expert Testimony at Hearings

Dr. Louis Lombardi testified as a medical expert at the initial administrative hearing that was held on April 11, 2006. (Tr. 830-37.) Dr. Lombardi summarized Arvanitakis's medical record and indicated that Arvanitakis's impairments did not meet or equal a listed impairment. (Tr. 834-36.) His opinion was that Arvanitakis's RFC was for light work after determining that she could sit for six out of eight hours per day, stand/walk for six out of eight hours, and lift/carry up to 25 pounds. (Tr. 836.) He also indicated that he had examined "new notes . . . indicating [a] relatively low RFC," but stated that he did not rely on them in determining an opinion of Arvanitakis's RFC because the notes did not appear to be written on the basis of a comprehensive medical evaluation. (Tr. 835)

Dr. Richard Wagman testified as a medical expert in Arvanitakis's second administrative hearing on June 29, 2010. (Tr. 1055-64.) Dr. Wagman also summarized Arvanitakis's medical record. (Tr. 1055-58.) Dr. Wagman stated that although he generally agreed with Dr. Ocampo's assessment, he thought Dr. Ocampo's opinion that Arvanitakis could only walk a total of one hour a day was excessive and not consistent with the record. (Tr. 1059-60.) Dr. Wagman disagreed with Dr. Lombardi's determination that Arvanitakis could perform light work, and opined that Arvanitakis was "limited to sedentary work at best." (Tr. 1060.)

## DISCUSSION

### I. Standard of Review

Under § 405(g) of the Social Security Act, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing a final decision of the Social Security

Administration ("SSA"), the Court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009)); accord Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("In reviewing the Commissioner's denial of benefits, the courts are to uphold the decision unless it is not supported by substantial evidence or is based on an error of law."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and citation omitted). The Court, however, must bear in mind "that it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

## II. Evaluating Disability Under the Social Security Act

An individual is under a disability if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for disability insurance benefits, a claimant must establish that she became disabled while she had insured status. Id. §§ 423(a)(1)(A), 423(c); see Arnone v. Bowen, 882 F.2d 34, 37-38 (2d Cir. 1989). It is undisputed that Arvanitakis met the insured

status requirement from November 12, 2002, her alleged onset date, through June 30, 2006. (Tr. 854.)

The Commissioner uses a five-step analysis to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1520. The Commissioner first determines whether the claimant is working; if she is engaging in substantial gainful activity, the claim will be denied without consideration of any medical evidence. 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). If the claimant is not working, the Commissioner determines whether she has a severe impairment that significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c), 404.1521. If the claimant is found to have such an impairment, the third inquiry is whether, based solely on medical evidence, she has an impairment or combination of impairments that meets or equals one of the listings in appendix 1 of subpart P of part 404 of Title 20, Chapter III of the Code of Federal Regulations ("Appendix 1"); if so, the claimant will be found disabled with no further inquiry. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 404.1525, 404.1526.

If the claimant does not have a listed impairment, the fourth inquiry is whether, despite her severe impairment, she has the RFC to perform her past work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f), 404.1560(b). To determine the claimant's RFC, the Commissioner must consider all of the claimant's impairments, not just those deemed severe. 20 C.F.R. §§ 404.1520(e), 404.1545(a). If the Commissioner finds that the claimant's RFC is sufficient for her to perform past relevant work, the claimant will be found not disabled and her claim denied.

If the claimant's RFC does not permit her to engage in her prior work, or if the claimant does not have any past relevant work, the fifth and final step requires the Commissioner to

determine whether the claimant, in light of her RFC, age, education, and work experience, has the capacity to perform "alternative occupations available in the national economy." Decker v. Harris, 647 F.2d 291, 298 (2d Cir. 1981); see 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g). The burden falls on the Commissioner to establish that there is gainful work in the national economy that the claimant could perform. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004). If no such gainful work in the national economy exists, the claimant will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

### III.    The ALJ's Decision

ALJ Fier applied the above five-step analysis in concluding that Arvanitakis was not disabled within the meaning of the Social Security Act. First, ALJ Fier found that Arvanitakis did not engage in substantial gainful employment from her alleged onset date through her date last insured. (Tr. 855.) At the second step, ALJ Fier concluded that Arvanitakis's panhypopituitarism and diabetes "resulted in more than minimal limitations in the claimant's ability to engage in basic physical work-related activities." (Id.) ALJ Fier next concluded that Arvanitakis's conditions did not meet or equal the criteria of any listed impairment in Appendix 1. (Tr. 856.)

At the fourth step of the analysis, ALJ Fier determined that, in spite of Arvanitakis's medical condition, she retained the RFC to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). (Id.) Sedentary work requires the ability to lift or carry no more than ten pounds. 20 C.F.R. § 404.1567(a). The full range of sedentary work also requires that an individual be able to sit for approximately six hours of an eight-hour workday, and stand or walk for no more than two hours during an eight-hour workday. See Social Security Ruling ("SSR") 96-9p, 1996 WL 374185, at *6 (S.S.A. July 2, 1996). In finding that Arvanitakis could perform

a full range of sedentary work, ALJ Fier afforded no weight to opinions from two of Arvanitakis's treating physicians, Dr. Ocampo and Dr. Mastakouris, as well as an opinion from her physical therapist, Mr. Tsolis, all of which suggested that Arvanitakis may not be able to perform a full range of sedentary activity. ALJ Fier only relied on Dr. Ocampo's opinion to the extent it was consistent with sedentary work, and afforded "great weight" to the opinion of the non-treating, non-examining medical expert Mr. Wagman, who testified, based on the medical record, that Arvanitakis could perform a full range of sedentary work. (Tr. 860-62.)

Based on the determination that Arvanitakis could perform a full range of sedentary work, ALJ Fier found that she was capable of performing her past relevant work as a data entry clerk. (Tr. 862.) ALJ Fier therefore found that Arvanitakis was not under a disability from her alleged onset date through her date last insured. (Id.) Because ALJ Fier determined that Arvanitakis was not under a disability at the fourth step, he did not reach the last step of the analysis.

## IV. The ALJ Failed to Properly Apply the Treating Physician Rule

It is well-settled that "[t]he opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013); see also 20 C.F.R. § 404.1527(c)(2). This so-called "treating physician rule" reflects the judgment that treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

If a treating source is not given controlling weight, "the Commissioner must 'give good reasons in his notice of determination or decision for the weight he gives [the claimant's] treating source's opinion.'" Botta v. Barnhart, 475 F. Supp. 2d 174, 187 (E.D.N.Y. 2007) (quoting Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998)). In determining the appropriate weight to give a treating physician's opinion, the ALJ is directed to consider the:

> [l]ength of the treatment relationship and the frequency of examination; the [n]ature and extent of the treatment relationship; the relevant evidence . . . , particularly medical signs and laboratory findings, supporting the opinion; the consistency of the opinion with the record as a whole; and whether the physician is a specialist in the area covering the particular medical issues.

Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(5)) (internal quotation marks omitted). Failure to give good reasons is a ground for remand. See Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); Botta, 475 F. Supp. 2d at 187 (citing Schaal v. Apfel, 134 F.3d 496, 503-04 (2d Cir. 1998)).

A. The ALJ Improperly Discounted Dr. Ocampo's Opinion

Here, the ALJ did not give any weight to Dr. Ocampo's April 10, 2006 opinion that Arvanitakis could stand and walk for a total of one hour a day but only ten minutes at a time without interruption, due to "dyspnea upon exertion," or shortness of breath. (Tr. 861.) In declining to accord any weight to this opinion, the ALJ reasoned that that it was contradicted by: (1) findings from Dr. Kassapidis in 2003; (2) findings from New York Hospital in July 2006; (3) Arvanitakis's positive response to treatment; and (4) Arvanitakis's ability to drive and travel to Greece. (Id.) The ALJ therefore credited the medical expert's testimony that Dr. Ocampo's assessment as to Arvanitakis's ability to stand and walk was "excessive." (Id.)

These reasons do not, however, constitute sufficiently "good reasons" for rejecting the opinion of Arvanitakis's long-term treating physician. As an initial matter, the ALJ's reliance on

Dr. Kassapidis's findings in 2003 is misplaced. Dr. Kassapidis is an orthopedic surgeon who treated Arvanitakis for her knee pain, (Tr. 97-98), and the fact that she recovered from her knee surgery in 2003 does not directly contradict Dr. Ocampo's assessment that Arvanitakis's ability to walk and stand is limited due to her difficulty breathing. Moreover, Dr. Kassapidis's findings in 2003 should not have been afforded more weight than Dr. Ocampo's more recent findings from 2006. See, e.g., Ligon v. Astrue, No. 08-CV-1551(JG)(MDG), 2008 WL 5378374, at *12 (E.D.N.Y. Dec. 23, 2008) ("While it is certainly appropriate to consider prior physicians' statements, to give them greater weight than a treating physician's more recent findings without additional explanation amounts to legal error.").

Further, it is unclear how the medical records from July 2006—when Arvanitakis was admitted to the hospital after she fainted—contradict Dr. Ocampo's opinion as to Arvanitakis's inability to walk or stand for more than an hour; indeed, the ALJ's decision does not discuss specifically what findings from July 2006 he relied on in reaching this conclusion. The medical records from July 2006 indicate that Arvanitakis was still suffering from panhypopituitarism, weakness, anemia, and low blood pressure. (Tr. 444-45, 1057.) To the extent a doctor who appears to have only treated Arvanitakis on this one occasion noted that her breathing was normal on July 21, 2006, (Tr. 444-45), this is not sufficient to overcome the opinion of Arvanitakis's treating physician. See Ryszetnyk v. Astrue, No. 12-CV-2431(SLT), 2014 WL 2986700, at *9 (E.D.N.Y. July 1, 2014) (finding that ALJ violated treating physician rule by, among other things, relying on the report of a doctor who met with the claimant only once which did not opine on claimant's "ability to sit, stand or walk, other than to say that [claimant's] gait was grossly normal" (internal quotation marks and alterations omitted)). Similarly, the ALJ's reference to Arvanitakis's "positive response to treatment" is not consistent with the record,

which indicates that despite adhering closely to her prescribed treatments, she continued to suffer from fatigue, weakness, and unpredictable fluctuations in her physical state. (Tr. 364, 1058.) Medical records also indicate that despite controlling her diabetes and attempting hormone replacement therapy, Arvanitakis continued to do poorly. (Tr. 951, 960.)

Contrary to the ALJ's determination that the record contradicts Dr. Ocampo's opinion, the record as a whole is largely consistent with his assessment in 2006 regarding Arvanitakis's limited ability to walk and stand due to shortness of breath. Among other things, the record indicates that in 2003, Arvanitakis suffered from panhypopituitarism, adrenal insufficiency, growth hormone deficiency, degenerative disc disease, and severe fatigue. (Tr. 91-96.) In July 2003, Arvtanitakis was admitted to the hospital for dehydration, fever, and gastroenteritis, at which time it was noted that Arvanitakis suffered from "dyspnea on exertion." (Tr. 137.) In September 2004, she was admitted to NYHQ after she fell, and complained of weakness, dizziness, and shortness of breath. (Tr. 282.) Then, in 2006, both Dr. Ocampo and Dr. Mastakouris, another treating physician for Arvanitakis, indicated that Arvanitakis could only walk and stand for one hour in an eight hour day. (Tr. 350, 362.) Arvanitakis's physical therapist, Mr. Tsolis, similarly indicated in 2006 that Arvanitakis could only walk and stand for one to one-and-half hours in an eight hour day, and that she could not perform a full range of sedentary work. (Tr. 355.)[4] The physician who took over Arvanitakis's treatment after Dr.

---

[4] With respect to Mr. Tsolis's opinion, defendant states that physical therapists "are not acceptable medical sources," and their opinions are therefore "attributed less weight." (Def.'s Mem. at 22.) Although this is accurate, the Court notes that the opinions of physical therapists, which are considered opinions from "other sources," are important evidence for adjudicators to consider in determining whether a medical opinion from an "acceptable medical source" is supported by the record. See Social Security Ruling 06-03P, 2006 WL 2329939, at *4 (S.S.A. Aug. 9, 2006) ("Although 20 CFR 404. 1527 and 416.927 do not address explicitly how to evaluate evidence (including opinions) from 'other sources,' they do require consideration of such evidence when evaluating an 'acceptable medical source's' opinion. For example, SSA's regulations include a provision that requires adjudicators to consider any other factors brought to our attention, or of which we are aware, which tend to support or contradict a medical opinion. Information, including opinions, from 'other sources'—both medical sources and 'non-medical sources'— can be important in this regard."). Moreover, to the extent the ALJ gave no weight to the physical therapist's

Ocampo, Dr. Tibaldi, also indicated in 2010 that Arvanitakis suffered from "chronic shortness of breath and [was] unable to perform day-to-day activities." (Tr. 951.)

In addition to the ALJ's error in finding that the record contradicted Dr. Ocampo's opinion, he also failed to discuss other factors an ALJ is directed to consider in determining the weight to accord a treating physician's opinion—namely, the length of treatment, the frequency of examination, and the nature of the treatment relationship. "Generally, the longer a treating source has treated [the claimant] and the more times [the claimant] has been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). Although the ALJ noted that Dr. Ocampo has treated Arvanitakis since January 2001 and that Arvanitakis saw him at least "every two to three months," (Tr. 857), he did not explicitly consider how this impacted the weight to give Dr. Ocampo's 2006 opinion regarding Arvanitakis's ability to stand and walk.

Indeed, instead of considering Dr. Ocampo's opinion, which was based on his treatment of Arvanitakis since 2001, the ALJ afforded "great weight" to the opinion of a medical expert who never treated or examined Arvanitakis. (Tr. 862.) This medical expert testified, based on the medical record, that Arvanitakis could perform a full range of sedentary work and testified in particular that Dr. Ocampo's assessment of Arvanitakis's ability to stand and walk was "excessive." (Tr. 1059-60.) The ALJ credited this testimony, explaining that it was consistent with the same portions of the record that allegedly contradicted the opinion of Dr. Ocampo. As discussed above, however, the ALJ erred in finding that those portions of the record constituted sufficiently good reasons to reject the opinion of Arvanitakis's long-term treating physician. Moreover, given that the medical expert never treated or examined Arvanitakis, the ALJ erred in

opinion because it was inconsistent with Arvanitakis's recovery after her knee surgery in 2003, the Court finds that this is not an inconsistency in the record for the reasons discussed above.

according the medical expert's opinion "great weight," particularly in light of the fact that it was inconsistent with the opinions of Arvanitakis's treating opinions. See Fernandez v. Astrue, No. 11-CV-3896(DLI), 2013 WL 1291284, at *14-15 (E.D.N.Y. Mar. 28, 2013) (finding ALJ committed error in giving non-examining, non-treating expert's opinion "great weight"). Accordingly, the ALJ failed to properly apply the treating physician rule with respect to this portion of Dr. Ocampo's 2006 opinion.

B. <u>The ALJ Improperly Discounted Dr. Mastakouris's Opinions</u>

The ALJ also erred in declining to accord any weight to two opinions from another treating physician for Arvanitakis, Dr. Mastakouris, who similarly began treating Arvanitakis in 2001. (Tr. 959.) First, the ALJ did not afford any weight to Dr. Mastakouris's April 11, 2006 assessment that "indicated that [Arvanitakis] could not perform sedentary work," stating that the opinion "did not provide findings to support his assessment." (Tr. 861.) This is not a "good reason" to reject a treating physician's opinion: "[T]he lack of specific clinical findings in the treating physician's report, in and of itself, is insufficient to support an ALJ's failure to credit the treating physician's opinion." Hart v. Colvin, No. 13-CV-2455(JFB), 2014 WL 4904810, at *14 (E.D.N.Y. Sept. 30, 2014); see also Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (finding that "[t]he lack of clinical findings complained of by the ALJ did not justify the failure to assign at least some weight to [the treating physician's] opinion"); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Rather, if the ALJ was concerned that Dr. Mastakouris's medical opinion lacked proper clinical foundation, the ALJ was obligated to follow-up with him before discounting his opinion. Schaal, 134 F.3d at 505; Hart, 2014 WL 4904810, at *14-15 (remanding case to ALJ when ALJ rejected opinion of long-term treating physician due to lack of clinical findings supporting the opinion, and stating that "the ALJ should have recontacted

[the treating physician] before rejecting his opinion"). Further, the Court notes that the ALJ, in rejecting Dr. Mastakouris's assessment, failed to acknowledge that it was consistent with the opinions of Dr. Ocampo and Mr. Tsolis, and that Dr. Mastakouris had a long-term treating relationship with Arvanitakis.

The ALJ also rejected Dr. Mastakouris's assessment dated June 21, 2010. (Tr. 861-62.) Although this opinion is dated after Arvanitakis's last insured date, this assessment relates to the relevant period because, as Dr. Mastakouris explained in this assessment, he has treated Arvanitakis since 2001, and "[i]n the past 9 years, [he had] seen the patient . . . exhibiting [all of the symptoms of panhypopituitarism]." (Tr. 960.) These symptoms include "fatigue, low blood pressure, weakness, depression, decreased energy, muscle weakness or aching, decreased strength and exercise tolerance, weight gain and decreased muscle mass." (Id.) Dr. Mastakouris opined that, due to these symptoms, Arvanitakis was unable to lift more than two or three pounds or to sit for prolonged periods of time. (Id.) The main reason the ALJ cited for rejecting this opinion was that it was "contradicted by findings on physical examination by other treating sources, the positive response to treatment as shown by hospital records and the claimant's activities." (Tr. 861-62.) The ALJ relied on these same factors in rejecting Dr. Ocampo's opinion and, for the reasons stated above, they similarly do not constitute good reasons for rejecting Dr. Mastakouris's opinion. Accordingly, the ALJ erred in according no weight to Dr. Mastakouris's April 2006 and June 2010 opinions.

C. The ALJ Erred in Failing to Consider Medical Records from Dr. Tibaldi

Finally, the ALJ failed to consider or even acknowledge medical records from Dr. Tibaldi of Queens Diabetes and Endocrinology, who, according to testimony from Arvanitakis, became her treating physician when Dr. Ocampo left the practice. (Tr. 1047.) These records from 2009

22

and 2010 indicate that Dr. Tibaldi treats Arvanitakis for panhypopituitarism and diabetes. (Tr. 914.) Dr. Tibaldi notes that Arvanitakis "chronically feels fatigued and is unable to function," "continues to do poorly," and that she has "chronic shortness of breath and is unable to perform day-to-day activities," (Tr. 914, 951).

Given that the record indicates Dr. Tibaldi treated Arvanitakis in at least 2009 and 2010 on an ongoing basis, it appears that he was a treating physician and his opinion was entitled to controlling weight unless the ALJ explicitly discussed good reasons not to do so. See 20 C.F.R. § 404.1502 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."); Jones v. Apfel, 66 F. Supp. 2d 518, 525 (S.D.N.Y. 1999) (finding that physician who treated social security claimant's diabetes for two years on an ongoing basis satisfied definition of "treating physician"). Contrary to defendant's argument, the fact that these records post-date Arvanitakis's last insured date does not necessarily render them irrelevant. (See Def.'s Reply Mem. at 5.) Rather, these records may bear on the severity of Arvanitakis's impairments during the relevant period. See Lisa v. Sec'y of Dep't of Health & Human Servs., 940 F.2d 40, 44 (2d Cir. 1991) ("We have observed, repeatedly, that evidence bearing upon an applicant's condition subsequent to the date upon which the earning requirement [i.e., insured status] was last met is pertinent evidence in that it may disclose the severity and continuity of impairments existing before the earning requirement date . . . ." (internal quotation marks and citations omitted) (brackets in original)); Stewart v. Astrue, No. 10-CV-3032(DLI), 2012 WL 314867, at *10 (E.D.N.Y. Feb. 1, 2012) (finding that ALJ erred in rejecting medical evidence "simply because they were after Plaintiff's last insured date" and erred in failing to consider whether the "diagnoses applied retrospectively to the

insured period" (internal quotation marks and citations omitted)). Accordingly, the ALJ erred in failing to consider Dr. Tibaldi's medical records, whether they were relevant to Arvanitakis's symptoms from 2002 to 2006, and what weight, if any, they should be accorded.

## V.    Remand Is Appropriate

The Court therefore agrees with Arvanitakis that the ALJ failed to properly apply the treating physician rule with respect to the opinions of Dr. Ocampo, Dr. Mastakouris, and Dr. Tibaldi. As a result, the hypothetical posed to the VE may not have accurately reflected the extent of Arvanitakis's abilities. Among other things, the hypothetical posed to the VE indicated that Arvanitakis could perform a full range of sedentary work. (Tr. 1064-65.) The full range of sedentary work requires the ability to walk and stand for a total of two hours in an eight hour work day, but the opinions from these doctors suggest that Arvanitakis may not be able to perform a full range of sedentary work, in part because she is not able to walk or stand for more than one hour a day. (See Tr. 350, 362, 951.)

The Court, however, does not agree with Arvanitakis that the case should be remanded only for calculation of benefits. As discussed in this Court's March 31, 2014 order, remand for calculation of benefits is only appropriate when the record "provide[s] persuasive evidence of total disability that render[s] any further proceedings pointless." Williams v. Apfel, 204 F.3d 48, 50 (2d Cir. 2000). Although the ALJ improperly discounted the opinions of Arvanitakis's treating physicians, the record in this case is not sufficiently complete or persuasive with respect to her disability such that remand is unnecessary. Accordingly, the Court finds that remand for further administrative proceedings is warranted to allow the ALJ to fully consider the evidence from Arvanitakis's treating physicians.

The Court further finds that remand to a new ALJ is appropriate in this case. Although

24

the decision to assign a case to a new ALJ on remand is generally left to the discretion of the Commissioner, the Commissioner is directed to assign a new ALJ in this case in light of the procedural history and the fact that Arvanitakis is eligible for relief under the Padro settlement but has not elected to proceed under its terms. See Vicari v. Astrue, No. 05-CV-4967(ENV)(VVP), 2009 WL 331242, at *6 (E.D.N.Y. Feb. 10, 2009) (departing from general rule that reassignment to new ALJ is left to discretion of Commissioner and directing remand to new ALJ in light of previous ALJ's "fundamental errors of law" and "failure . . . to consider the full medical evidence before him"); see also Kolodnay v. Schweiker, 680 F.2d 878, 879-80 (2d Cir. 1982) (remanding for assignment to new ALJ after original ALJ failed to adequately consider full medical record).

On remand, the new ALJ should develop the record to satisfy any outstanding concerns about the findings of Dr. Ocampo and Dr. Mastakouris, and consider whether the medical records from Dr. Tibaldi are relevant to the severity of Arvanitakis's impairments before her date last insured. Arvanitakis's other arguments, such as the allegedly erroneous credibility determination, shall be directed in the first instance to the new ALJ on remand. See, e.g., Hiller v. Astrue, No. 11-CV-4131(JS), 2012 WL 4511374, at *2 (E.D.N.Y. Sept. 28, 2012) (remanding case when ALJ misinterpreted the treating physician's opinion and directing the ALJ on remand to "consider the remaining objections that [p]laintiff raised in her appeal"); Kearney v. Barnhart, No. 05-CV-1860(JG), 2006 WL 1025307, at *7 (E.D.N.Y. Apr. 17, 2006) (remanding case for consideration of claim in accordance with treating physician rule and stating that claimant's "other arguments, such as the claimed failure to develop the record, shall be directed in the first instance to the ALJ on remand"). The Court is also mindful of the fact, emphasized by Arvanitakis, that her application for disability insurance benefits was first filed ten years ago.

25

(Pl.'s Mem. at 14.)  Accordingly, the Commissioner shall conduct a hearing and issue a decision within 120 days of this order.  See, e.g., Bommarito v. Astrue, No. 07-CV-4529(CBA), 2008 WL 5085093, at *3 (E.D.N.Y. Dec. 2, 2008) (remanding case when ALJ failed to develop the record in considering the opinions of treating physicians and directing that the Commissioner conduct a hearing and issue a decision within 120 days given the duration of the proceedings).

## CONCLUSION

For the foregoing reasons, the case is remanded pursuant to 42 U.S.C. § 405(g) for further proceedings before a new ALJ.  Defendant's motion for judgment on the pleadings is denied.  The Clerk of the Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated: May 11, 2015
      Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge